[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These Consolidated and cross action cases involve the disputed ownership of land in Killingworth. In the first case, the plaintiff, Jeremiah G. Adametz, claims ownership of the land and seeks to quiet title. In a second count, he alleges trespass and claims damages. Amended Complaint, January 27, 2000. [106] The defendants in that action, Mary Adametz, the Estate of Walter J. Adametz, and Walter J. Adametz, Jr., deny plaintiff's (Jeremiah G.') ownership. The three defendants counterclaim alleging and claiming ownership by adverse possession. Counterclaim, November 10, 1998. [103] Plaintiff denied the material allegations of the Counterclaim. Answer to Counterclaim, April 21, 1999. [104]
In the second action, Walter J. Adametz, Jr., the Estate of Walter J. Adametz, and Mary G. Adametz, are the plaintiffs and Jeremiah G. Adametz, Sr., and Jeremiah G. Adametz, Jr. are the defendants. In this second action, the three plaintiffs (who are the defendants in the first action) seek injunctive relief and damages. They seek to enjoin defendants (Jeremiah G. Adametz and Jeremiah, G. Adametz, Jr.,[1] from interfering with their use of the disputed property which interference began allegedly in December 1999, after the first action was brought.[2]
Amended Complaint
 The plaintiff in the first action, Jeremiah G. Adametz and the now deceased Walter J. Adametz, Sr., were brothers, sons of Jeremiah E. Adametz, also now deceased. Mary F. Adametz is the widow of Walter J. Adametz, Sr., and also the administratrix of his estate. Walter J. Adametz, Jr., is the son of Walter J. Adametz, Sr., and Mary F. Adametz. Jeremiah G. Adametz, Jr., is the son of Jeremiah G. Adametz.
In this memorandum, Jeremiah G. Adametz is referred to as "plaintiff." CT Page 10954 Mary F. Adametz, the Estate of Walter J. Adametz, Sr., and Walter J. Adametz, Jr., are referred to collectively as the "defendants, " and individually as "defendant."
The trial of this case began on July 18, 2001. The court had reviewed the pleadings. At the court's suggestion, the action to quiet title count of the first case was tried along with the counterclaim for adverse possession. All other parts of the two cases were bifurcated. The parties agreed to this arrangement.
By virtue of the evidence and concessions by defendants' counsel, the court finds that the plaintiff, Jeremiah G. Adametz is the record owner of the 92 acre tract. That tract is shown on Exhibit 2 as "13 92.2 AC."
Defendants claim they acquired title to all of that land shown on Exhibit 2 which lies to the north of a yellow line drawn thereon and the extension of that yellow line west to Bethke Road.[3]
In 1956, plaintiff, Jeremiah G. Adametz, and his sister, Grace R. Adametz, were the grantees of a deed from their father, Jeremiah E. Adametz. In that deed, the father, Jeremiah E. Adametz reserved a life estate for himself. The property as conveyed was subject to two mortgages. Exhibit 1. In 1962, Grace R. Adametz conveyed her interest to her brother, plaintiff Jeremiah G. Adametz. Exhibit 5. On April 15, 1965, Jeremiah E. Adametz released his life estate. Exhibit 55. Upon that release of the life estate, plaintiff, Jeremiah G. Adametz, became the sole owner of the property.
Any adverse possession against plaintiff could not begin until the life estate ended.
 "Possession adverse to a life tenant is not per se adverse to a remainderman. A remainderman, having no right to possession until the death of the life tenant, or not being bound to enter until then to establish a claim against interference with an easement of way appurtenant to the property, is not barred by adverse possession that might result against the life tenant. Thus, where there is adverse occupancy of land subject to a life estate, the statute of limitations does not generally run against the remaindermen until a life estate has terminated, for until then the possession is not adverse as to them, since they do not have a right of entry and possession until the life estate is ended." [Footnotes CT Page 10955 omitted.] 3 Am.Jur.2d 304, Adverse Possession § 267 (2002).
See also, Standard Company v. Young, 90 Conn. 133, 135-6 (1916); New Haven Trust Co., 83 Conn. 360, 365 (1910).
Any claimed period of adverse possession against plaintiff Jeremiah G. Adametz could not have begun until April 15, 1965.
The plaintiff's father, Jeremiah E. Adametz, had lived in the homestead house located on the property. The house, 1 Alders Bridge Road, was located on Alders Bridge Road very near its intersection with Route 81. Since 1965, the plaintiff and his wife have lived in that homestead house.
Defendant, Walter J. Adametz, Sr., plaintiff's brother, was also given properties by the father, Jeremiah E. Adametz. One of those properties is depicted on Exhibit 2 as 30 Pond Meadow Road, "14 7.4 AC." Walter J., Sr., married Mary F. Adametz in 1951. They built a home on the northwest corner and sold it. The house and property sold are shown on Exhibit 2 as lot 15, 24 Pond Meadow Road. Walter J. Sr. and Mary F. then built there home on lot 14. Walter J. lived there until his death in 1997.
As have the parties, the court in this memorandum uses the term "homestead" for the property owned by plaintiff which defendants do not claim to own by adverse possession. Similarly, the property which defendants claim to have acquired by adverse possession is referred to as the "farm."
A brief statement on the law of adverse possession is in order.
 "`[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and without the consent of the owner. Whitney v. Turmel, 180 Conn. 147, 148, 429 A.2d 826 (1980); Ruick v. Twarkins, 171 Conn. 149, 155, 367 A.2d 1380
(1976); Arcari v. Dellaripa, 164 Conn. 532, 536, 325 A.2d 280 (1973); Clark v. Drska, [1 Conn. App. 481, 485, 473 A.2d 325 (1984)].' Ruggiero v. East Hartford, 2 Conn. App. 89, 96, 477 A.2d 668, (1984); see also Stevens v. Smoker, supra, 84 Conn. 574
(approving instructions given to jury on essential CT Page 10956 elements of adverse possession)." 1525 Highland Associates, LLC v. Fohl, 62 Conn. App. 612, 622
(2001); cert. denied, 256 Conn. 919 (2001).
 "The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner. (Internal quotation marks omitted.) Lazoff v. Padgett, 2 Conn. App. 246, 248, 477 A.2d 155, cert. denied, 194 Conn. 806, 482 A.2d 711 (1984); see also Lord v. Mansfield, 50 Conn. App. 21, 30-31, 717 A.2d 267, cert. denied, 247 Conn. 943, 723 A.2d 321
(1998). "`Adverse possession must be proven by the claimant by clear and convincing evidence. . . . Oak Leaf Marina, Inc. v. Ertel, 23 Conn. App. 91, 93, 579 A.2d 568, cert. denied, 216 Conn. 827, 582 A.2d 206
(1990).'" Goodrich v. Diodato, 48 Conn. App. 436, 442, 710 A.2d 818 (1998)." [Internal quotation marks omitted.} Kramer v. Petisi, 53 Conn. App. 62, 67
(1999); cert denied, 249 Conn. 919 (1999).
The burden of proof to establish adverse possession is a high one.
 A finding of adverse possession "is not to be made out by inference, but by clear and positive proof. `[C]lear and convincing proof' . . . denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Citations omitted; internal quotation marks omitted.) Wildwood Associates, Ltd. v. Esposito, 211 Conn. 36, 42, 557 A.2d 1241 (1989)." Top of The Town v. Somers Sportsmen's Assn. Inc., 69 Conn. App. 839, 844
(2002).
"The burden of proof is on the party claiming adverse possession." CT Page 10957Kramer v. Petisi, supra, 53 Conn. App. 67. Defendants assumed a high burden when they alleged adverse possession.
The evidence clearly establishes defendants used at least part of the property they now claim. But they have not shown the use was hostile or the like. Plaintiff knew they were using at least part of the property for the grazing of cattle, some raising of produce, and also taking firewood both for their own use and for sale.
The evidence might establish defendants' use of the property was open, visible and notorious. It was no secret that defendants were farming on the property. Plaintiff well knew they were. But, there is no evidence, much less credible evidence, that defendants' use of the property was hostile, under a claim of right, or without permission of the plaintiff.
During the years in question, plaintiff and Walter J. Adametz, Sr., and their families visited back and forth. The defendants attended picnics and used the pools at plaintiff's home. Defendants also participated in holiday gatherings at plaintiff's. In determining defendants' use of the property was not hostile the court found these facts significant.
Plaintiff testified he let defendants use the property because Walter J. Sr. was his brother. The court finds this evidence credible. Defendants have not refuted that testimony. In fact, in their brief, defendants have hardly addressed whether their use of the property was with plaintiff's permission and consent. The court holds that defendants' use of the property was with plaintiff's permission and consent. "[Defendants] failed to show an essential element of their adverse possession claim, namely, that the disputed property was used without the consent of the-owner." Kramer v. Petisi, supra, 53 Conn. App. 68.
The fencing defendants put up was solely for the containment of the livestock. The fences were not meant to show the boundaries of the land defendants claim. The fences, except in a rare instance, were not on the boundaries of the land defendants claim. Defendants testified they did not fence the property to keep anyone, and in particular the plaintiff, off the property. They did not post signs to keep people off the property or otherwise show any visible activity to keep plaintiff or any one else off the property. They did nothing which would show the plaintiff they were claiming the property as their own and to the exclusion of the plaintiff.
Defendants Mary F. Adametz and Walter J. Adametz, Jr., testified that on many occasions plaintiff was asked to convey the disputed property to Walter J. Sr. Walter J. Jr. testified that in approximately 1970-1972, CT Page 10958 his grandfather, Jeremiah E. Adametz, showed the line that is now the "yellow line" and said that he wanted plaintiff to convey the land north thereof to Walter J. Sr. According to Walter J. Jr. his grandfather repeated this in later years. On several occasions through the years, again according to Walter J. Jr., Walter J. Sr. asked plaintiff to convey that land to him but plaintiff responded vaguely saying "what's the rush" or the like. The court does not find Walter J. Jr.'s testimony on this credible. However, even if these exchanges did occur, it does not help defendants. The court interprets Walter J. Jr.'s testimony regarding the supposed requests for a deed as compelling evidence that defendants knew they did not have a claim of right and further that defendants knew and understood a deed was needed for them to acquire the property. It shows Walter J. Sr. knew he had the use of the land by grace of the plaintiff. It is strong evidence negating their claim of adverse possession.
The plaintiff denied that any requests or exchanges as described in the previous paragraph occurred. The court believes plaintiff's testimony is true.
Defendants produced much testimony and pictorial evidence about haying operations. It was later admitted by defendants that most and nearly all of this haying was on the plaintiff's homestead property which is not part of the land claimed by the defendants. How this evidence was germane is not clear. It does not cut in favor of the defendants.
Plaintiff testified he walked the property and gathered firewood at will. He allowed others to do likewise and to hunt. Plaintiff's son and his friends used the property on many occasions for target shooting and to ride all terrain vehicle (s). Defendants never even attempted to keep plaintiff off the disputed land. Nor were any of those given permission to use the land kept off the land by the defendants. The court does not find the plaintiff was dusted from possession and kept out uninterruptedly for even fifteen minutes.
There is no credible evidence from which the court could conclude defendants' use of the farm was hostile. Nor is their credible evidence for a conclusion that defendants' use was exclusive. Defendants' use was by far more intense than plaintiff's. But, plaintiff continued to use the property as he liked and as his own. Certainly, there is no credible evidence plaintiff was ousted of possession.
A small part of the land was used for a gardens. The gardens were moved periodically. By far, most of the land plaintiffs used was for livestock grazing. There is no credible evidence that the disputed land was used for anything other than gardens and grazing. Much of the land plaintiffs CT Page 10959 now claim is theirs was wetland. Some was forest or woodland. There is no evidence the grazing occurred in wetlands or woodlands. Just how much of the land was used for grazing is far from clear. The boundaries of the land actually used for the garden(s) and grazing have not been established.
The evidence does not show just what part of the land claimed was actually used by defendants. The defendants claim they used the disputed property as a farm and hive thereby acquired it by adverse possession. But, in their brief, defendants state: "The sale of the timber in 1990 to Rossi Corporation cannot be considered a step of dominion as it occurred in an area of the land claimed by the Defendants where there was no farming activity." Defendant's Memorandum of Law, September 13, 2001, p. 27. Since the only evidence of possession even approaching the possession necessary to establish adverse possession is that which came about by defendants farming the land, they could not establish adverse possession "in an area of land claimed by the Defendants where there was no farming activity." Id. The defendants claim adverse possession of all land north of the "yellow line" on Exhibit 2 and its straight line extensions to the east and west. But they admit that some of that land was "where there was no farming activity." The court has been unable to determine just where the boundaries of the land where there was farming activity. Thus, defendants' claim of adverse possession must fail also because they have not established the boundaries of the land claimed to have been acquired by adverse possession. It was their burden to do so.
For some time there was a gravel pit on the disputed property or farm. In 1976 or 1977, Walter J. Sr. learned the town was looking for a site for bulky waste disposal area. He suggested to plaintiff that he (plaintiff Jeremiah G.) offer the gravel pit for that purpose. Plaintiff asked Walter J. Sr. to look into it. Walter J. Sr. did. Eventually, the town leased the property from plaintiff alone for the bulky waste disposal site. The original lease period began on April 15, 1978 and lasted one year. The lease was renewed for at least one more year. The rent paid by the town was paid to plaintiff alone; Walter J., Sr., did not seek to or share in the rent proceeds in any way.
It is significant that Walter J. Sr. consulted plaintiff about the bulky waste site opportunity and then arranged to have plaintiff actually lease the land to the town for the bulky waste site. This is clear evidence that plaintiff, owned the land. It is an unequivocal recognition on Walter J. Senior's part that his own use of the land was done with the permission of his brother, the plaintiff.
This is highly significant. CT Page 10960
 "The key issue here is whether the defendant's use of the property . . . was under a claim of right. A `claim of right' does not necessarily mean that the adverse possessor claims that it is the proper titleholder, but that it has the intent to disregard the true owner's right to possession. Horowitz v. F.E. Spencer Co., 132 Conn. 373, 378, 44 A.2d 702
(1945); Mentz v. Greenwich, 118 Conn. 137, 146, 171 A. 10
(1934). Conversely, `[i]f any [defendant] during the period in question recognized the plaintiff's ownership of the land, in words or by [its] conduct, the defendant cannot claim that [its] possession was adverse to the plaintiff.' Connecticut Jury Instructions, Wright Havanich, citing Horowitz v. F.E. Spencer Co., supra, 378-79; see also Kramer v. Petisi, 53 Conn. App. 62, 71, 728 A.2d 1097, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999), citing Lazoff v. Padgett, 2 Conn. App. 246, 250, 477 A.2d 155, cert. denied, 194 Conn. 806, 482 A.2d 711 (1984) (`"`possession of one who recognizes or admits title in another, either by declaration or conduct, is not adverse to the title-of such other'"'). As in the prescriptive easement context, a would-be adverse possessor's recognition of the true owner's right to terminate the permission shows permissive use. See Klar Crest Realty, Inc. v. Rajon Realty Corp., 190 Conn. 163, 168, 459 A.2d 1021 (1983)." Top of The Town v. Somers Sportsmen's Assn. Inc., 69 Conn. App. 839, 843-4 (2002).
Walter J. Senior's actions in connection with the bulky waste site negate any claim that he "ha[d] the intent to disregard the true owner's {plaintiff's} right to possession." Id. It is also shows a clear recognition on his (Walter J. Senior's) part of "plaintiff's ownership of the land." "[T]he defendant cannot claim [his] possession was adverse to plaintiff. Id. Walter J. Senior's "possession [was by] one who recognizes or admits title in another, either by declaration or conduct, " it was "not adverse to the title of [the plaintiff]. Id., 844.
Plaintiff's lease of the land to the town for the bulky waste site was a use of that land by plaintiff defeating any claim that the defendants, or any of them, used the land exclusively. It negates any claimed ouster because plaintiff was not kept out without interruption for fifteen years. CT Page 10961
Thus, even if defendants had the makings of a colorable claim of adverse possession going from April 15, 1965 (when the plaintiff's father relinquished his life estate plaintiff) until April 1978 when the bulky waste events occurred, Walter J. Senior's recognition of plaintiff's ownership and title scuttled any chance for the ripening of adverse possession because the required fifteen years had not passed.[4] The court holds that no valid claim for adverse possession was established as of April 1978. And, any later period of adverse possession could begin no earlier than April 1980 when the bulky waste site lease and its extension expired.
In October 1990, plaintiff contracted with the Rossi Corporation for the timbering of approximately 75 acres of his land. Before the timbering could begin, it had to be approved by the Killingworth Planning and Zoning Commission and the Wetlands Commission. In November 1990, an application was submitted to the Wetlands Commission which included several maps showing the land to be timbered. Exhibit 16. The land which was the subject of the timbering contract included a substantial part of the land the defendants-have since claimed they acquired by adverse possession. At a hearing on the application, Walter J. Senior appeared and apparently spoke in favor of the timbering plan analogizing timber to potatoes and that both, when matured, should be harvested. There is no evidence Walter J. Sr. made any claim that any part of the land to be timbered was his.
Walter J. Adametz, Jr., and his wife, Cindy, testified that when the timbering was in progress, they and Walter J. Adametz, Sr., went to plaintiff's house on the day following Thanksgiving and complained to plaintiff about the timbering. The year this occurred was said to be 1989, 1990, or 1991. Since the application was not filed with the Wetlands Commission until November 1990, the Thanksgiving incident probably occurred in 1990 or 1991. Apparently, Walter J. Sr., had been taking trees for firewood for sale for some time; he told "plaintiff that the timbering would ruin his livelihood. According to Walter J. Jr., and his wife, Cindy, Walter J. Sr. asked plaintiff to stop the timbering on the land Walter J. Sr. used. Again, according to Walter J. Jr. and his wife, Cindy, plaintiff said he would put a stop to the timbering. Again, according to Walter J. Jr. and Cindy, the timbering on that part of the land stopped.
Plaintiff's testimony differed markedly. He had offered the timbering rights to Walter J. Sr. previously but Walter J. Sr. but Walter J. Sr. was not interested. At the incident which occurred on the day after Thanksgiving, according to plaintiff, Walter J. Sr. complained that the CT Page 10962 logging would jeopardize his income; he asked plaintiff to stop the logging. Plaintiff stated he could not stop the logging as he was bound by the contract. Plaintiff did nothing to stop the logging.
The court finds plaintiff's version to be the credible account.
Walter J. Sr. never made any claim that he was entitled to any money paid by the Rossi Corporation to plaintiff for the timber.
There is no evidence that at the time of the timbering incident any of the defendants claimed that they, or any of them, as opposed to plaintiff, owned the property now claimed to have been acquired by adverse possession.[5]
Walter J. Senior's conduct regarding the timbering incident again evinces a recognition on his part that plaintiff owned the property. He did not approach Rossi Corporation himself and demand they stop the timbering "on his land." Rather, he went to plaintiff and asked him to have the timbering stopped. The court finds that Walter J. Sr. did not "[intend] to disregard the true owner's (plaintiff's) right to possession." Top of The Town v. Somers Sportsmen's Assn. Inc., supra,69 Conn. App. 843). Thus, Walter J. Sr. did not then make any indication he had a "claim of right." Id. And, Walters J. Senior's asking plaintiff to have the timbering stopped is yet another instance when Walter J. Sr., by his words and conduct, recognized plaintiff's ownership of the land. It cannot be held that Walter J. Senior's possession was adverse to plaintiff. Id. The court holds that at the time of the timbering, Walter J. Senior by his words and conduct recognized his use of the land was permissive.
Furthermore, plaintiff's contracting with Rossi Corporation to log the land is an unequivocal entry by plaintiff onto the land. It was a use of that land by plaintiff defeating any claim that the-defendants, or any of them, used the land exclusively. It negates any claimed ouster because plaintiff was not kept out without interruption for fifteen years.
The court holds that no valid claim for adverse possession was established as of the timbering in 1990 or 1991. And, any then period of adverse possession could have begun no earlier than April 1980[6], the requisite fifteen year period had not elapsed.
Walter J. Senior died on May 10, 1997. Plaintiff started this suit in October or November 1998. The fifteen year period for a valid adverse possession period could not have elapsed between the timbering events ( 1990) and the institution of this lawsuit. CT Page 10963
At all times plaintiff paid the real estate taxes on the disputed property. Defendants acknowledge they did not pay any of the taxes due on the disputed land. Payment of the taxes by the defendants would have been "powerful evidence" in defendant's favor. Although defendants claim they paid the taxes on two buildings erected on the disputed property,[7]
that cuts against them; it is at least a tacit acknowledgment they did not own the land.
 "Payment of property taxes is "`powerful evidence'" to show that the occupier claimed the land as his own; Wren v. Parker, 57 Conn. 529, 531, 18 A. 790 (1889); see also Merwin v. Backer, 80 Conn. 338, 345, 68 A. 373
(1907); Merwin v. Morris, 71 Conn. 555, 574-75, 42 A. 855
(1899); Kelman v. McDonald, 24 Conn. App. 398, 399-400, 588 A.2d 667 (1991); although it is not dispositive. See Marshall v. Soffer, 58 Conn. App. 737, 745-46, 756 A.2d 284 (2000). In addition to impliedly recognizing that it did not own the property by paying taxes on the improvements but not on the property itself, the defendant seemed to recognize expressly that it was occupying the land with permission until shortly before the plaintiff Top of the Town, LLC, issued the termination notice. Top of The Town v. Somers Sportsmen's Assn. Inc., supr. 69 Conn. App. 849.
Walter J. Senior died on May 10, 1997. Mary F. Adametz, is a defendant individually and as the administratrix of the Estate of her late husband, Walter J. Adametz, Senior. As administratrix, she filed an inventory with the probate court. The inventory is dated September 17, 1997 and was subscribed and sworn to by the defendant Mary F. Adametz. The inventory did not mention any ownership interest in the property now claimed to have been acquired by adverse possession. Exhibit 49. And, as of the time of trial, it had not been amended to include the disputed property. This failure to include the disputed land in the sworn inventory cuts strongly against the defendants.
On the day of Walter J. Sr.'s funeral, the family and friends gathered at his daughter's house. Mary F. Adametz, just widowed, asked plaintiff if they could continue to use the farm for the livestock as they had been doing over the years. This is further evidence that defendants knew they had been using the farm with plaintiff's permission.
In 1998, plaintiff contracted to sell a large part of his land to a developer. A substantial part of the land to be sold was north of the CT Page 10964 "yellow line." The developer, Tom Smith thereafter walked the property and went to the defendant Mary F.'s home. Walter J. Jr.'s wife Cindy was there. Smith told her of the impending sale. This caused quite of bit of concern to defendants. Shortly thereafter, they had their lawyer write to plaintiff telling him for first time that defendant claimed to have acquired the property by adverse possession. They thereafter erected gates and signs belatedly asserting their claim of ownership.
Plaintiff contracted to sell the property for $300,000. When Smith learned of defendants' claim of ownership, he realized his subdivision plans were in some jeopardy. He negotiated with defendants but not with plaintiff. Defendants agreed to quitclaim to Smith or his corporation their supposed interest in that part of the land plaintiff had contracted to sell and in which defendants claimed to have acquired ownership. Defendants were paid $30,000 and 40 cords of firewood. Smith also agreed to erect fencing along the boundary of the proposed subdivision and the land still claimed by defendants. Significantly, Smith made no attempt to negotiate with plaintiff to reduce the $300,000 plaintiff was to be paid. Plaintiff was paid the full $300,000. The court takes this as demonstrating to some degree that Smith did not view the defendants' claim of adverse possession as having significant merit. Rather, defendants were "bought off" by Smith in order to avoid the delay inherent in litigation.
Based on the foregoing, the court finds the issues for the plaintiff and against the defendants.
Judgment shall enter quieting and settling title to the subject property in the plaintiff, Jeremiah G. Adametz; it is further adjudged that the defendants, Mary Adametz, the Estate of Walter J. Adametz, and Walter J. Adametz, Jr., do not have any estate, interest in or encumbrance on the property or any part thereof.
Parker, J.